STATE v. JERENE STRINGER, Appellant.—No. 40747.—211 S. W. (2d) 925.

Division Two, May 27, 1948.

Rehearing Denied, June 14, 1948.

*Samuel Richeson* for appellant.

*J. E. Taylor*, Attorney General, and *Harry H. Kay*, Assistant Attorney General, for respondent.

[926] BARRETT, C.—On Thursday, the 15th of August 1946, at eleven o'clock in the morning, the appellant, with the attendance of a doctor, gave birth to a normal, nine months male child. The appellant was twenty-three years old, a single girl, employed in a shoe factory. She lived with her sister in a one-room building on the banks of Britton Creek in Potosi. She had made no preparation whatever for the baby's birth and the doctor's daughter, who was a nurse and assisted her father in the accouchement, brought clothes for the baby. As they were leaving the daughter stated that she would leave the baby clothes but the appellant said that she would not need them. When the doctor asked for the baby's name she answered that it had no name and requested that he say nothing about the baby's birth. A little girl in the neighborhood discovered that there was a baby in the building and about 2 o'clock walked in and asked to see it. The appellant told her that the baby was no longer there, that she had given it to some friends in St. Louis. On the following Saturday the doctor and his daughter again called on the appellant and she told them that she had given the baby to some people in St. Louis. In the afternoon the sheriff and the prosecuting attorney called and inquired about the baby. She informed them that she had given it to some friends of the nurse's in St. Louis. The sheriff did not believe her and insisted that she tell him the truth. She then told the sheriff and the prosecuting attorney that she tired of her position in the bed and wanted to move, that the baby had been lying between her and the wall, and when she picked it up to move over she accidentally dropped it on its face on the floor and it died. She said: "I was so scared I didn't know what to do." So, within two hours of its birth, she took the baby out back of the house and hid it in the weeds. Neighbors made a search along the creek bank

and found the bones of a newly born baby. The inference is that dogs had devoured the child.

[927] Upon a trial for murder the jury found her guilty of manslaughter and assessed her punishment at five years and one day in the penitentitiary.

The appellant admitted that she dropped the baby on the floor and that it died as a result of the fall. Her defense was that its death was accidental—an excusable homicide. But from the admitted facts and the circumstances that she had made no preparation for the baby's birth, did not want any clothes for it, asked the doctor to conceal its birth and her secretion of its body (Annotation, 2 A. L. R. 1227) the jury could reasonably find that she intentionally, voluntarily and willfully dropped the baby, thereby causing its death, a voluntary homicide or manslaughter. Mo. R. S. A., Sec. 4382. The evidence being circumstantial, the child's homicidal death and someone's criminality in connection with it—the corpus delicti (State v. Hawkins, (Mo.) 165 S. W. (2d) 644, 646)—may be inferred from the appellant's obvious motive in the circumstances. State v. Smith, 329 Mo. l. c. 279, 44 S. W. (2d) l. c. 48. In one sense a proper definition of voluntary manslaughter is the unjustifiable, inexcusable and intentional killing of a human being without deliberation, premeditation and malice. State v. Holliday, 353 Mo. 397, 398, 182 S. W. (2d) 553, 554; State v. Stark, (Mo.) 151 S. W. (2d) 1095, 1096; State v. Hart, 309 Mo. 77, 83, 274 S. W. 385, 386. It is arguable, in the circumstances, that there was sufficient evidence to support a conviction of murder in the second degree (State v. Cade, 326 Mo. 1132, 34 S. W. (2d) 82) even though an intentional homicide may be manslaughter. State v. Gadwood, 342 Mo. 466, 494, 116 S. W. (2d) 42, 58. The appellant does not question these rules or the sufficiency of the evidence to support the inferences noted and they are set forth for a complete understanding of her insistence, nevertheless, that she is entitled to be discharged upon this appeal.

Omitting the introduction, the information in this case charges that the appellant "on or about the fifteenth day of August, 1946, then and there, in and upon the body of a certain male child of tender age lately being born of the body of her, the said Jerene Stringer, the name of which infant child is unknown to your informant aforesaid, then and there being, feloniously, unlawfully, willfully, deliberately, premeditatedly, on purpose and of her malice aforethought, did make an assault on him, the said infant child aforesaid, in some way and manner and by some means, instruments and weapons to your informant unknown, did then and there feloniously, unlawfully, willfully, deliberately, premeditatedly, on purpose and of her malice aforethought, kill, murder and deprive of life so that he, the said infant child aforesaid, then and there died; and so your informant, upon his oath aforesaid, does say that the said Jerene

Stringer, him, the said infant male child aforesaid, in some manner and way and by some means, instruments and weapons to your informant unknown, did then and there feloniously, unlawfully, willfully, deliberately, on purpose and of her malice aforethought at and in said County of Washington and State of Missouri, on or about the fifteenth day of August, 1946, kill and murder against the peace and dignity of the State."

A careful reading of the information reveals that it does not expressly charge "that the deceased was given a mortal wound by the defendant." It is urged therefore that the court erred in refusing to quash the information. Since there was no testimony directly concerning such a mortal wound it is claimed that there was no evidence of the appellant's criminal agency in connection with the death, consequently there was no proof of the corpus delicti and insufficient evidence to support either a conviction or a submission of manslaughter.

As we have indicated, the admitted facts and the circumstantial evidence permit all the inferences necessary to support a submission and conviction of manslaughter unless the elements insisted upon by the appellant are absent and essential to the charge and conviction. The trial court also submitted whether the appellant was guilty of first or second degree murder and whether the child's death was accidental as the appellant claimed but the jury disregarded [928] these instructions and found her guilty of manslaughter. It is possible that this latter fact alone is a sufficient answer today to the appellant's assignments of error in this respect. Since this court has held in State v. Sundheimer, 93 Mo. 311, 6 S. W. 52, however, that an indictment or information for manslaughter must contain all the allegations essential and necessary to a charge of murder, except the elements of deliberation, premeditation and malice, the fact that she was convicted of manslaughter only may not be sufficient to distinguish this and the cases relied upon. In that case the court said: "Perhaps, if we consider the phraseology of the indictment, solely and merely, in the popular significance of the terms employed, it may be deemed to import and express" the necessary elements of manslaughter. The court conceded that the indictment charged that the defendant "did kill and slay said William Singer, by then and there discharging a gun in and upon his face and head, whereby he received such injuries as to cause his death," but, *nevertheless,* the court held that the indictment did not clearly and distinctly state and express the facts constituting the offense because "this last allegation fails and omits to expressly say that the death, so caused by said injuries, then and there ensued, and this is required, . . . ."

In State v. Green, 111 Mo. 585, 20 S. W. 304, the court said: "The (proper) form for this indictment is found in 3 Chitty On Criminal Law, pages 750 and 752, and in note 'd' the learned author lays it

down, that 'the word strike should always be inserted where death is caused by violence,' '' and the indictment, having omitted this allegation of substance, was bad. In State v. Brown, 168 Mo. l. c. 454, 68 S. W., l. c. 569, the first count of an indictment was held bad because it did not use the words '' 'thereby giving to him the said George L. Richardson' or words of similar import. Lacking these words, this count does not *directly* charge that George L. Richardson was 'given' a mortal wound.'' In State v. Williams, 184 Mo. 261, 83 S. W. 756, the court followed Chitty and State v. Green and held an information insufficient because it failed to charge '''a felonious striking, penetrating and wounding of the said Clark.' '' These cases were followed in State v. Johnson, 191 Mo. 177, 90 S. W. 89. In State v. Birks, 199 Mo. 263, 97 S. W. 578, an information was held to be insufficient because ''It fails to charge that Marion Thomas was given a mortal wound by reason of the alleged assault upon him with the gun. In other words, following the charging of the assault by shooting at said Thomas with a gun, the words 'thereby giving to him, the said Marion Thomas, one mortal wound,' or words of similar import, are entirely omitted, *leaving the charge without any connection between the shooting at the deceased with the gun and the infliction of the mortal wound.*'' The underscored quotation is the reason given for the necessity of the allegation. These cases, which are representative of a large number, were all instances of first or second degree murder. Up to the present they have been distinguished, technically, several times but in the distinguishing cases there was a charge of a mortal wound. State v. Kenyon, 343 Mo. 1168, 126 S. W. (2d) 245; State v. Ballance, 207 Mo. 607, 106 S. W. 60.

The underlying and really basic reasons for the enforcement of the extremely technical requirements of common law indictments and informations have often been noted and we indicate them but briefly. At common law all felonies, particularly all homicides, were punishable by death. 1 Stephen, History Of The Criminal Law Of England, p. 487; 1 Hale, Pleas of The Crown, p. 351. There were the attendant consequences of attainder, forfeiture of property and corruption of blood. 2 Coke Upon Littleton, 391b. Of necessity some palliatives to these severe judgments and their consequences had to be invented. ''Undoubtedly, the merciful inclination of the judges in favor of life accounts for a large part of the purely technical requirements in the old indictments. The technical rules served a justifiable and even necessary purpose in restraining the brutal severity of the criminal law a century (and a half) ago.'' 10 Har. L. R. 98, 101 (1897). (See also the notes in 39 U. Mo. B. 37 and 30 Jour. Crim. L. & Crim., p. 135 and a comparison of the indictment as it was in [929] State v. Barrington, 198 Mo. 23, 95 S. W. 235, and as it would be today under the English practice in 12 St. L.

L. R. 281.) These basic reasons for the rules have ceased to exist and "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule persists from blind imitation of the past." Holmes "The Path Of The Law" (10 Har. L. R. 457).

The conviction here is of manslaughter and what we have said does not necessarily mean that the rules are to be relaxed completely or that the cases noted must necessarily be overruled in toto. "Since the common law prevails in this jurisdiction, indictments and informations charging felonies must conform to the common law rules of pleading by which great strictness and technical accuracy are exacted." State v. Anderson, 298 Mo. 382, 391, 250 S. W. 68, 70. The statute of jeofails (Mo. R. S. A., Sec. 3989) does not permit the omission of any necessary element of substance but the circumlocutions and repetitions of the common law are no longer essentials of substance. State v. Borders, (Mo.) 199 S. W. 180. The constitutional right of the accused "to demand the nature and cause of the accusation" (Const. Mo., Art. 1, Sec. 18) is satisfied when and means that "the accused might be definitely informed as to the nature of the charge against him, and that, when determined, it might constitute a complete bar to another prosecution for the same offense." State v. Borders, 199 S. W., l. c. 182; Const. Mo., Art. 1, Sec. 19. "While it is true in a criminal charge that nothing (of substance) must be left to intendment or implication, this rule must be construed as having reference to such allegations as are necessary to inform the defendant of the nature and cause of the accusation against him; and not to extrinsic matter the averment of which is unnecessary and if averred need not, . . . be proved." State v. Hascall, 284 Mo. 607, 615, 226 S. W. 18, 20. As applied to this case, so far as substance is concerned an information for manslaughter means what it did at common law but if the omission is not essentially one of substance and there is no possible prejudice to the rights of the accused it is not necessary that the information follow the ancient form set forth in 3 Chitty, Criminal Law, p. 750— the 5th American edition of 1847. Ex Parte Keet, 315 Mo. 695, 287 S. W. 463. If the substantive elements and the essence of the offense are unmistakably set forth and the accused's connection with the offense is plainly charged by direct and positive averments manifestly the reasonable requirements of the common law are satisfied. Mo. R. S. A., Sec. 3952; State v. Burns, 99 Mo. 471, 12 S. W. 801; Ex Parte Keet, supra.

The information under consideration does not charge in specific terms that the child "was given a mortal wound by the defendant." For the purposes of this appeal it may be assumed that it is not good as a charge of murder in the first or second degree but it may never-

984

theless be sufficient as a charge of manslaughter and if so will support the submission if the evidence justifies it as we have indicated. State v. Colvin, 226 Mo. 446, 126 S. W. 448; State v. Morgan, 196 Mo. 177, 95 S. W. 402; State v. Frazier, 339 Mo. 966, 98 S. W. (2d) 707; State v. Rennison, 306 Mo. 473, 267 S. W. 850. The information alleges that "in some way and manner and by some means, . . . to your informant unknown" (State v. Poor, 286 Mo. 644, 228 S. W. 810) that the appellant made an assault upon the child and feloniously, unlawfully, willfully and on purpose did "kill, murder and deprive of life" the said child—all of which is again repeated in the conclusion. "The indictment charges that appellant 'wilfully and unlawfully' killed the deceased. 'Wilful' means intentional, that is to say, that the killing of deceased was not excusable. 'Unlawful' means there was no legal justification for killing of the deceased. Since the indictment omits the elements of first and second degree murder, it sufficiently charges the crime of manslaughter." State v. Holliday, 353 Mo., l. c. 398, 182 S. W. (2d) l. c. 554. Just what would an allegation of the infliction of "a [930] mortal wound" add to the essence of the charge? Just what information of substance would such an additional allegation convey to the accused? In testifying she admitted that she dropped the baby on the floor and that it died as a result of the fall. The only meritorious question was whether she accidentally dropped it and should therefore be acquitted or whether she intentionally dropped it and killed it and was therefore guilty of manslaughter. State v. Colvin, supra; State v. Barrington, supra.

■ This brings us to the problem of whether certain evidence was admissible and if not whether its admission prevented a fair trial and was therefore unjustly prejudicial to the rights of the accused. The facts and circumstances noted were established by the testimony of two neighbors and the little girl, by the doctor and his daughter and by the sheriff and the prosecuting attorney. In addition to these witnesses the state produced the Coroner of Washington County, Dr. Dempsey. When he was first offered as a witness defense counsel inquired as to the purpose of his testimony and the prosecutor said: "The purpose of the inquiry is to show *there was never any report made by the defendant to the coroner* of the county; Washington County, Missouri, *of the death of this baby.*" When defense counsel objected to this offer the court expressed the opinion that the state could show that the witness was the Coroner and then inquire whether anyone had reported the death to him. This question was then asked: "Has anyone made a report to you since August 15, 1946, on August 15 or since that time, with regard to the death of a male child that was born to Jerene Stringer?" The answer was "No, I did not receive any official notice."

The state contends in any event that the evidence could not have been prejudicial to the accused and was therefore harmless error.

It is contended that no jury would be influenced against the accused merely because the coroner said that no one had reported the death in question to him. In this connection it is argued that the jury could not have considered the failure of the defendant to report the death to the coroner as of any consequence because they would be unaware of the duty to report a death to the coroner.

However, from the prosecuting attorney's initial statement and from the context it is plain that the purpose of the testimony was to show that the accused had not reported the child's death to the coroner. He was finally permitted to say that no one had officially reported the death to him, but of what consequence could that fact have been unless it meant that the appellant had not reported it? In the second place, the argument erroneously assumes that there was some legal duty on the general public and particularly upon the accused to report the child's death to the coroner. An examination of the statutes does not reveal any such general public duty. Mo. R. S. A., Secs. 9767, 13227-13268, 14839. The statute requiring the coroner to summon a jury ''so soon as he shall be notified of the dead body of any person, supposed to have come to his death by violence or casualty,'' (Mo. R. S. A., Sec. 13231) does not necessarily impose any such specific duty upon an accused or, for that matter, upon the general public.

But irrespective of any duty on the part of the general public it is certain that there was no statutory duty on the accused to report the child's death to the coroner and the meritorious question is whether the plain inference that there was such a duty was unfairly prejudicial in the circumstances of this trial. As we have pointed out, the evidence to show that the appellant intentionally killed the child was wholly circumstantial. There was the fact of no preparation for the baby's birth, her desire to conceal its birth and its identity and finally her concealment of its body. 26 Am. Jur., Secs. 302, 475. Any circumstance, including the desire to elude discovery, reasonably pointing to the defendant's guilt was admissible against her. 1 Wharton, Criminal Evidence, Sec. 299, p. 395. But here her failure to report the child's death to the coroner is not necessarily inconsistent with her innocence. In some instances failure to report a death might be a most cogent circumstance pointing to guilt. For example, in Hedger v. [931] State, 144 Wis. 279, 128 N. W. 80, a husband knew that his wife lay dead in the kitchen of their home, a victim of violence, and yet he failed to report the fact to anyone and so contrived that someone else should apparently be the first to discover her. In this case it is obvious that the appellant did not intend to report the child's death at all—on the contrary, she attempted to conceal it—and the fact that she did not report it to anyone or to some person who in the normal course of events she would naturally have been expected to report it to is a strong indication of guilt. The

fact of this plain inference demonstrates the damaging quality of the coroner's evidence that she had not reported the child's death to him.

She was under no statutory duty to do so and there was no compulsion, in the circumstances, for her reporting it to the coroner. Had he talked to her in his official capacity as the sheriff and the prosecuting attorney did, or even as a friend, there might then have been some reason for her divulging the child's death. But here there was no duty or circumstance compelling a voluntary report by the accused to the coroner in any capacity. The evidence was circumstantial, no preparation, secrecy and hiding the body, and in addition to these circumstances the state added the circumstance of her failure to report the death to the coroner. In arriving at her intention the jury may have considered and weighed against her the additional fact and circumstance that she had not reported the child's death to the coroner. No one knows what force and weight the jury may have attributed to the office and functions of coroner and the failure of the accused to voluntarily report this instance to him. The testimony of the coroner was prejudicial and in the circumstances of this case infringed the appellant's right to a fair trial, a conviction upon only those circumstances from which it was a fair and reasonable inference that she intentionally killed the child.

Because of the unfairly harmful effect of the introduction of this evidence the judgment is reversed and the cause remanded. *Westhues* and *Bohling, CC.,* concur

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. All concur except *Tipton, P. J.,* not sitting.